**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

In re:                                     )
                                           )
    RICHARD A. BURDETT, JR.      )  Case No. 12-12066-BFK
                                           )  Chapter 7
        Debtor            )

**MEMORANDUM OPINION**

In this Chapter 7 bankruptcy case, the Debtor concedes that there is a presumption of abuse under Section 707(b)(1) of the Bankruptcy Code. The Debtor contends, nevertheless, that there are "special circumstances" within the meaning of Section 707(b)(2) of the Code that overcome the presumption of abuse. The creditor, Ms. Chapin, filed a Motion to Dismiss pursuant to Section 707(b) of the Bankruptcy Code. Docket Nos. 26 & 33. The Debtor has filed an Opposition to the Motion. Docket No. 41.

The Court conducted an evidentiary hearing on the Motion on November 19, 2012, at which the Debtor, Mr. Burdett, testified as the only witness. The Court allowed post-trial briefs from the parties, which were filed on December 19, 2012. Docket Nos. 66-67. Upon hearing Mr. Burdett's testimony, and reviewing the submissions of the parties, the Court concludes that the presumption of abuse has not been overcome in this case.[1]

**Findings of Fact**

Having heard the testimony and having reviewed the evidence, the Court makes the following findings of fact:

---

[1] On June 28, 2012, the Office of the United States Trustee filed a statement that the case should be presumed to be an abuse under Section 707(b). Docket No. 21. On the same day, the U.S. Trustee filed a statement indicating that he did not consider a Motion under Section 707(b) to be appropriate, based on the U.S. Trustee's "review/ consideration of additional information and mitigating factors provided by debtor." Docket No. 22. The U.S. Trustee re-filed this latter statement on August 16, 2012. Docket No. 40.

1.     The Debtor is a highly successful salesman of electronic equipment to the federal government.  Tr. at 47-48, Nov. 19, 2012.[2]

2.     The Debtor filed his bankruptcy case in this Court on March 30, 2012 (the "Petition Date").  On the Petition Date, his B-22A form indicated that he had $12,266.90 in gross income per month.  Docket No. 13, Form B-22A, Line 3.

3.     On the Petition Date, the Debtor was employed with Accuvant, where he had a salary of $125,000 per year.  Tr. at 47-48.  He was employed with Accuvant from April 2011 to October 29, 2012.  Tr. at 47-48, 53.

4.     Prior to Accuvant, the Debtor was employed with a company called Longview.  Tr. at 49:5-7.  He was employed with Longview from October 2010 through April 2011.  Tr. at 50:13-17.  He had a salary with Longview of $120,000 per year. Tr. at 50:18-24.

5.     Prior to Longview, the Debtor was employed with Lumeta.  Tr. at 51:6-7.  He was employed there from November 2009 through October 2010, where he had a salary of $125,000 per year.  Tr. at 51:17-19.

6.     The Debtor's tax returns indicate that he had gross income in the amount of $207,139 for 2011, and $193,220 for 2010.  Movant's Ex. 6 (Line 22); Tr. at 56-67.[3]

7.     After he filed his bankruptcy case, the Debtor left Accuvant, and took a position as the Director for Partnerships and Strategic Alliances with Nisga'a Data Systems, beginning on October 29, 2012.  Tr. at 53-54.  This was to be a three month consulting position, subject to the position being renewed or extended.  As of the time of the hearing on the Motion to Dismiss, the

---

[2] References to "Tr." are to the Transcript of the hearing on November 19, 2012.

[3] It is not clear to the Court what accounted for the additional income on the Debtor's tax returns, over and above the Debtor's salary at Longview, Lumeta and Accuvant during 2010 and 2011, where he worked for between $120,000 and $125,000 in salary per year.

2

Debtor was receiving a salary of $150,000 per year, plus a six percent (6%) commission on the net profit for sales for which he was responsible. Tr. at 55. He is considered to be self-employed, not an employee of Nisga'a. Tr. at 53-55.

8. The Debtor is divorced. Tr. at 22-23. He lives with his significant other. Tr. at 22. She is not employed and does not appear to contribute materially to the household expenses (though, the Debtor testified, she has money, not income, of her own). Tr. at 24, 62.

9. The Debtor has two daughters, both of whom are in college. Tr. at 27-34. When they are not away at college, they live part of the time with their mother and part of the time with the Debtor. *Id.* Under the parties' divorce agreement, they are considered to be emancipated adults. Tr. at 30. The Debtor does not claim his two daughters as dependents on his income tax returns. Tr. at 30. The Debtor does not pay for their tuition, but he does pay for books and other incidental costs of their education. Tr. at 30-31.

10. The Debtor's Schedule D states that the Debtor owed the IRS $53,232.00 on the Petition Date for tax years 2006 through 2010. Docket No. 13 (Debtor's Schedule E). Of this amount, $16,219.00 is secured by tax liens. Docket No. 47 (Debtor's Amended Schedule D). All of this debt is asserted to be priority debt. Docket No. 13 (Debtor's Schedule E).

11. The Debtor has entered into a repayment plan with the IRS under which the IRS has agreed to accept an initial payment of $316, which was made, and subsequent monthly payments in the amount of $211. Tr. at 44-46.

12. The Debtor pays $2,400 per month to his ex-wife in spousal support. Tr. at 35-36. This will be reduced by the agreement of the parties to $1,000 per month, starting in June 2016. Tr. at 36.

13.     The Debtor received what amounted to a one-time signing bonus of $10,000 within the six months preceding the filing of his bankruptcy case.  Tr. at 60.

14.     The Debtor's health care premiums have increased from $201 to $1,292 per month because he is now self-employed.  Tr. at 65.

15.     Finally, the Debtor was receiving $2,083 in Board of Director advisory fees from GSS during the six months preceding the case.  Tr. at 20.  However, these fees have ended and are no longer being paid to him.  Tr. at 20-21.

## Conclusions of Law

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference of the U.S. District Court for this District of August 15, 1984.  This is a core proceeding, within the meaning of 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate).  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409(a).

*1.  "Special Circumstances" Under Section 707(b)(2)(B) of the Bankruptcy Code.*

Section 707(b) of the Bankruptcy Code provides, under certain circumstances, for a presumption of abuse for individual debtors whose debts are primarily consumer debts.  Specifically, the presumption of abuse applies (in the words of the statute, "the court *shall* presume abuse exists" (emphasis added)) if the Debtor's current monthly income (CMI),[4] reduced by the national, local and additional allowable expenses, multiplied by 60, "is not less than the lesser of: (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or

---

[4] The term "current monthly income" means average monthly income from all sources (with certain exceptions not relevant here) that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) during the six month period preceding the bankruptcy case.  11 U.S.C. § 101(10A).

$7,025, whichever is greater; or (II) $11,725." 11 U.S.C. § 707(b)(2)(A)(i)(I)-(II). This is known generally as the "means test."[5]

The presumption of abuse may be rebutted "by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(i). The Code further requires that

> In order to establish special circumstances [under Section 707(b)(2)(B)] the debtor shall be required to itemize each additional expense or adjustment of income and to provide –
> (I)    documentation for such expense or adjustment to income; and
> (II)   a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

11 U.S.C. § 707(b)(2)(B)(ii).

In this case, the Debtor concedes that the presumption of abuse exists. He maintains, however, that there are "special circumstances" under Section 707(b)(2)(B) that rebut the presumption. Specifically, the Debtor maintains that there are three important changes to his finances that constitute special circumstances: (a) he no longer has the $2,083 in monthly Board of Directors advisory fees from GSS; (b) the $10,000 signing bonus artificially increased his monthly income because it is not a recurring item of income, similar to the Debtor's circumstances in *Hamilton v. Lanning*, __ U.S. __, 130 S. Ct. 2464 (2010); and (c) the Debtor's health insurance premiums have increased from $201 per month to $1,292 per month as a result of his new employer treating him as a consultant instead of as a full-time employee.

---

[5] The presumption of abuse applies only to debtors whose annual income is higher than their State's median income, so-called above median debtors. 11 U.S.C. § 707(b)(7). There is no question that the Debtor in this case is an above median debtor.

5

The burden of proof to rebut a presumption of abuse rests with the Debtor. 11 U.S.C. § 707(b)(2)(B)(iii); *In re Williams*, 2010 WL 3292812, at *4 (W.D. Va. 2010) ("Thus, where the UST has produced evidence in support of its Form 22A line item calculations, and where the UST's calculations result in the debtor failing the means test, the burden of going forward shifts to the debtor to demonstrate that the particular line item expenses computed by the UST are in error"); *In re Meade*, 420 B.R. 291 (Bankr. W.D. Va. 2009).

The term "special circumstances" is not defined in the Bankruptcy Code. Rather, Section 707(b)(2)(B)(i) provides two non-exclusive examples of what constitute special circumstances—a serious medical condition or a call to active duty in the armed forces. The courts disagree on what sort of proof meets the "special circumstances" test. This Court previously has noted that "it seems clear that Congress intended 'to set this bar extremely high, placing it effectively off limits for most debtors.'" *In re Parulan*, 387 B.R. 168, 172 (Bankr. E.D. Va. 2008) (quoting *In re Haar*, 360 B.R. 759, 760 (Bankr. N.D. Ohio 2007)).[6]

The courts have diverged on whether to apply a narrow view, under which the circumstances must be truly extraordinary, or a more broad view, under which the standard is more lenient and may include more ordinary circumstances. *See In re Davis*, 2011 WL 5884015, at *4 (Bankr. N.D. Tex. 2011) (contrasting the narrow view, where the debtor has "a significant burden to overcome," with the broad view, where "circumstances need not be extraordinary, unanticipated or outside the control of the debtor"); *In re Siler,* 426 B.R. 167, 172 (W.D. N.C.

---

[6] The Debtor argued: "*Parulan* was a Chapter 13 case, and was overruled by the Supreme Court in *Hamilton v. Lanning*, 130 S. Ct. 2464 (2010), where the Court specifically *did* allow for changes in income to be taken into account." Docket No. 67, Debtor's Brief at 8 (emphasis in original). The fact that *Parulan* was a Chapter 13 case is of no moment, as Section 707(b) applies both to above-means debtors in Chapter 7 and in Chapter 13. Further, Judge Mitchell specifically "decline[d] to enter into a particularly thorny area of statutory construction," and decided the case solely on the proof presented (or more accurately, the lack of proof). *Parulan,* therefore, was not "overruled" by *Lanning*.

2010) (collecting cases representing the broad view and the narrow view). Certainly, the courts agree that the issue of special circumstances is to be determined on a case-by-case basis. *In re Davis*, 2011 WL 5884015, at *4 (Bankr. N.D. Tex. 2011).

The Court views the language of the statute as the starting point for its interpretation. In using the term "such as," followed by two potentially life-altering events (serious illness or a call to active duty in the military), Congress requires a seriousness with respect to the term "special circumstances." Congress did not mean to make it impossible for debtors to meet this standard; had that been Congress's intent, it could have deleted the special circumstances exception altogether. Including the two special circumstances examples, however, signals an intent that the circumstances be of a more severe nature than ordinary job changes or income fluctuations. *Lanning,* 130 S. Ct. at 2477 ("Section 707 identifies as examples of 'special circumstances' a 'serious medical condition or a call or order to active duty in the Armed Forces,' [§ 707(b)(2)(B)(i)], and petitioner directs us to no authority for the proposition that a prepetition decline in income would qualify as a 'special circumstance.'"); *In re Meade*, 420 B.R. at 305 ("the particular facts relied upon by a debtor to establish 'special circumstances' ought to be of the same nature as the type of events cited by Congress to illustrate what it had in mind for such term, to-wit: 'a serious medical condition or a call or order to active duty in the Armed Forces'"); *In re DeJoy,* 2011 WL 5827319, at *4 (Bankr. N.D. N.Y. 2011) ("in order for the court to find special circumstances, a debtor must show that his or her situation rises to the same level of extremity as a serious medical condition or active duty in the armed forces").

    2. *The Debtor has Failed to Show Special Circumstances Within the Meaning of Section 707(b)(2)(B).*

The Court finds that the Debtor has not met his burden to show special circumstances warranting a departure from the means test and the presumption of abuse that arises in this case.

A. *The Debtor's Inability to Identify the Amount of his Potential Commissions from his New Employer Results in a Failure of Proof.*

The Debtor argues for a finding of special circumstances based on his pre-bankruptcy changes to income (the loss of the Board advisory fees, the fact that the $10,000 signing bonus is non-recurring) as well as on the post-petition increase in his health insurance costs from $201 to $1,298.[7] However, the Debtor's version of his finances is skewed. The Debtor currently is receiving an annual salary of $150,000 plus a 6% commission on sales for which he is responsible at his new position at Nisga'a Data Systems. Tr. at 53-55. This represents a $25,000 increase from the Debtor's base salary at Accuvant. Additionally, the Debtor is now receiving 6% in commissions. The Debtor was unable to identify the amount of the potential commissions, and to a certain extent, downplayed the potential for commissions, claiming that the margins in the government contracting industry are markedly thin:

> Q:   So, that could be substantial; correct?
>
> A:   Not when you're doing government business because it's net profit. Margins typically don't run – it's not on a gross number. It's on a net number. So, therefore, you do $500,000 worth of business and you're only making 3 [sic] percent on it, that's not a lot of money.

Tr. at 55. Simply put, the Court cannot objectively determine whether the Debtor is better or worse off after leaving Accuvant for Nisga'a Data Systems, without an understanding of the potential commissions, i.e., whether the Debtor's increase in health insurance costs and the self-employment tax will be partially or entirely offset by his increased base income and commissions.[8] The Debtor's inability to estimate the commissions resulted in a gap in the proof,

---

[7] The increase in health insurance premiums as a self-employed individual to $1,298, from the previous amount of $201, also is offset to a large degree by a deduction to adjusted gross income (that is, an "above the line" deduction) in the amount of $15,504 on the Debtor's Pro Forma Tax Return. *See* Docket No. 67, Ex. 3, Line 29.

[8] Under the circumstances, six percent (6%) of $500,000, or $30,000, would not be insignificant.

which in turn, caused the Debtor to fail in his burden to prove special circumstances. *See* 11 U.S.C. § 707(b)(2)(B)(iii) ("The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required").

> B. *The Debtor's Changes in Financial Circumstances are Insufficient to Constitute "Special Circumstances" Under Section 707(b)(2) of the Code.*

Putting aside the issue of the commissions, the Debtor's current employment pays him $150,000 annually. This is $25,000 more than his employment with Accuvant. The Debtor argues he has lost the GSS Board advisory fees in the amount of $2,083, or $24,996 annually, and has increased his health insurance premiums by $1,097 per month ($1,298 - $201), or $13,164 annually. Adding these two numbers together, the Debtor claims to have suffered an annual decrease in compensation of $38,160, compared to the B-22A form filed with the Court. However, this is only $13,160 more than the $25,000 in additional income that the Debtor is now making at Nisga'a Data Systems (again, not counting commissions). The Court concludes that this annual decrease of $13,160, while not insignificant, does not rise to the same kind of loss for this Debtor as a serious illness or activation in the military.[9] Moreover, the Court notes that the Debtor left Accuvant voluntarily, to act as a contractor with Nisga'a Data Systems. Presumably, when he made this move, he acted with the idea that it would be better for him financially, not worse.

---

[9] The Court uses the term "for this Debtor" advisedly. The loss of $13,160 for a Debtor making $150,000 per year is obviously less dramatic than the same loss for a debtor making $30,000 per year. The Debtor also testified at the hearing that the GSS Board advisory fees increased to $2,500 during the last 6 months of his term there. Tr. at 20-21. This would constitute a loss of an additional $417 per month, meaning that the Debtor's decline in annual income would be $43,164, for a net decline of $18,164 (after taking into account the Debtor's $25,000 increase in base salary, but again not counting commissions). For the reasons stated above, the Court does not view this increase as significant enough to enable this Debtor to leap over the hurdle of "special circumstances" under § 707(b)(2).

*C. The Debtor's Two Pro Forma B-22A Forms Substantially Overstate the Amount That is Contractually Due to the IRS on a Monthly Basis.*

The Court has reviewed the Debtor's two "pro forma" B-22A forms submitted with his post-trial brief. The Court notes initially that both of the Debtor's pro-forma B-22A forms omit references to the $10,000 signing bonus, so this is not an issue in evaluating the Debtor's alternative B-22A calculations. Docket No. 67, pp. 4 ("Exhibit 1 uses the Debtor's income as of the time of filing, excluding the two items not actually present at the time of the filing (the bonus and the advisory board)") & 5 ("Exhibit 2 shows the present job. Using current income, CMI increases to $12,500 per month"). In any event, the Debtor's present CMI of $12,500 does not differ materially from the income he originally stated on his B-22A Form of $12,266.90 per month, which the Debtor protests was artificially elevated due to the $10,000 signing bonus.

Both pro forma B-22A forms indicate that the Debtor is above median. The first uses the Debtor's filing date income with Accuvant of $125,000 per year (it actually uses an annual income of $127,380, or $10,615 per month). Docket No. 67, Ex. 1, Line 3. The second uses the Debtor's income with Nisga'a Data Systems of $150,000 annually, or $12,500 per month (but again, excluding commissions).[10] Docket No. 67, Ex. 2, Line 3. Both pro forma B-22A's arrive at the conclusion that there is no presumption of undue hardship under Section 707(b)(1). The Court finds, however, that both forms suffer from the same fundamental flaw—each uses the number $887.20 for secured payments to the IRS. This is calculated by dividing the IRS

---

[10] Both of the Debtor's pro-forma B-22A forms use "2" for the number of allowable persons—the Debtor and his significant other. Much time was spent at the hearing by the parties, arguing over whether the correct number was 2, 3 or 4, i.e., whether the Debtor's daughters should be included. The Debtor's final position, as stated in his post-trial brief, is that the number should be 3: himself, his significant other and one-half of each daughter. Docket No. 67, p. 6. However, even though the Debtor does provide support to his daughters, their presence in the household is sporadic and the Debtor's economic contributions to their well-being, while undoubtedly generous, result from his obligations as a father, not from any legal obligation to support his now emancipated, adult daughters. Under the economic unit test of *Johnson v. Zimmer (In re Johnson),* 696 F.3d 224 (4th Cir. 2012), the Court finds that the correct number is 2—the Debtor and his significant other.

obligation of $53,220 by 60—the number of months of that would be required in a Plan for an above mean Debtor in Chapter 13.  *See* Docket No. 67, Exs. 1-2, line 42(a).  In fact, the Debtor has entered into an agreement with the IRS whereby the IRS has agreed to accept the sum of $211 per month.  Tr. at 44-46.  The difference of $676 per month, from the perspective of the means test, is substantial, amounting to $40,560 over the life of a Chapter 13 Plan.  This is substantially more than the $11,725 on Line 52 of Form B-22A, and thereby gives rise to a presumption of abuse under *both* scenarios posited by the Debtor in his alternative, pro forma B-22A forms.

The Court concludes that the actual number being paid to the IRS, the $211 per month, as opposed to the $887, is the correct number for two reasons.[11]  First, the Bankruptcy Code provides that the Debtor is allowed a deduction for "the total of *all amounts scheduled as contractually due* to secured creditors in each month of the 60 months following the date of the filing of the petition . . . divided by 60."  11 U.S.C. § 707(b)(2)(A)(iii)(I) (emphasis added).  The Debtor's offer in compromise to the IRS, as accepted by the IRS, constitutes a binding contract.  *Topic 204 – Offers in Compromise*, http://www.irs.gov/taxtopics/tc204.html (last visited Feb. 26, 2013).  Therefore, only $211 per month is contractually due, not the $887 listed by the Debtor on Line 42(a) of both of his pro-forma B-22A forms.

Second, this approach is more consistent with *Lanning*, 130 S. Ct. 2464, *Ransom v. FIA Card Services, N.A.*, __ U.S. __, 131 S. Ct. 716 (2011) (holding that Debtor was not entitled to a deduction for car ownership costs where the Debtor did not own a vehicle at the time of filing) and *In re Quigley*, 673 F.3d 269 (4th Cir. 2012) (disallowing a secured debt vehicle deduction

---

[11]  The Court also questions whether the Debtor can decuct the entire IRS debt of $53,220 as secured debt, when in his Schedules he listed the debt as only being secured in the amount of his available property, $16,219.00.  In any event, the Court finds that the amount to be used in Line 42(a) should be the amount actually being paid to the IRS, not the entire amount of the debt divided by 60, for the reasons stated herein.

for surrendered vehicles). In *Lanning*, *Ransom* and *Quigley*, the Supreme Court and the Fourth Circuit have required a more real-world view, taking into account, for example, whether the Debtor actually owns a vehicle at the time of filing, or whether the Debtor intends to surrender property to secured creditors during the course of the case. In *Quigley*, the Fourth Circuit held:

> The amount of money at issue here is hardly inconsequential. In fact, it is quite significant in the context of this bankruptcy: the total amount that the Debtor sought to shield over the life of her Chapter 13 plan by deducting the ATV payments was $9,799.80, and removing that deduction would increase the Debtor's projected disposable income by almost two-thirds. Certainly under these circumstances, failing to account for such changes and thereby denying the unsecured creditors payments that the Debtor clearly could make would be just the sort of "senseless result[ ]" that the *Lanning* Court rejected.

673 F.3d at 274.

In this case, using the Debtor's actual payment of $211 constitutes a more real-world view of the Debtor's financial circumstances and ability to pay his creditors in a Chapter 13 case. The difference, as noted above, is significant - $40,560 over the life of a Chapter 13 Plan.

    D. *The Debtor's Projected Decrease in Spousal Support Payments Must be Taken Into Account.*

Finally, beginning June 1, 2016, the Debtor's spousal support payments will decrease from $2,400 per month to $1,000 per month. The Debtor filed this case on March 30, 2012. The Debtor, therefore, would have nine months remaining in a Chapter 13 Plan under which, in this District, he would be required to increase his payments by the savings of $1,400 per month, for a total of $12,600. Once again, this is more than the $11,725 that gives rise to a presumption of abuse under Section 707(b)(1) of the Bankruptcy Code.

## Conclusion

The Court concludes that the Debtor has not met his burden of proof to show special circumstances under 11 U.S.C. § 707(b)(2)(B), because:

(a) The Debtor has not sufficiently identified his current compensation, specifically, his commissions;

(b) The Debtor's base salary has increased by $25,000 post-petition;

(c) The Debtor has substantially overstated his monthly secured debt payments to the IRS in his pro-forma B-22A forms; and

(d) The Debtor's spousal support payments will decrease materially during the life of a hypothetical Chapter 13 Plan.

A separate Order shall issue dismissing this case under 11 U.S.C. § 707(b)(1).

Date: _____          _____
                                      Brian F. Kenney
Alexandria, Virginia                  United States Bankruptcy Judge


Copies to:

Richard A. Burdett, Jr.
2300 Mt. Vernon Avenue #230
Alexandria, VA 22301
Debtor

Daniel M. Press, Esquire
Chung & Press, P.C.
6718 Whittier Ave., Suite 200
McLean, VA 22101
Counsel for the Debtor

David Charles Masselli, Esquire
4113 Lee Highway
Arlington, VA 22207
Counsel for Pamela Chapin

Robert Ogden Tyler, Esquire
Tyler, Bartl, Ramsdell & Counts, P.L.C.
300 North Washington Street, Suite 202
Alexandria, VA 22314
Chapter 7 Trustee

Jack Frankel, Esquire
Office of the U.S. Trustee
115 South Union Street, Ste. 210
Alexandria, VA 22314